IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

          v.          :     CRIMINAL NO. 04-699

NOZZLE MANUFACTURING          :
COMPANY


GOVERNMENT'S ARRAIGNMENT,
PLEA, AND SENTENCING MEMORANDUM

I.          INTRODUCTION

The United States Attorney filed a one count
information on October 28, 2004 charging defendant Nozzle
Manufacturing Company with the attempted violation of the
Presidential Embargo against Iran in violation of Title 50,
United States Code, Section 1705(b).  Defendant Nozzle
Manufacturing had previously entered into a written plea
agreement with the government, the terms of which follow.
The parties have also agreed that the record contains
sufficient information to permit the Court to exercise its
sentencing authority without a presentence report.
Accordingly, the parties respectfully submit that the Court
may exercise its discretion in this case to arraign and

accept the defendant's plea, and to impose sentence, at the first hearing.

II.      **PLEA AGREEMENT**

The parties have entered into a written plea agreement pursuant to Fed. R.Crim.P. 11(c)(1)(C), the essential terms of which follow:

1.   The parties agree that the following specific sentence appropriately disposes of the case:

a.   Defendant shall pay a criminal fine of $10,000 on the date of sentencing.

b.   Defendant shall pay a special assessment of $400 on the date of sentencing.

c.   Under U.S.S.G. § 8D1.1, a period of corporate probation is neither mandatory nor necessary and shall not be imposed in this case because the corporation is no longer in business.

d.   Defendant agrees to the entry of a separate order by the Secretary of the U.S. Department of Commerce (the "Commerce Order") imposing a civil penalty of $10,000, to be paid at the time of sentencing.  The Commerce Order shall

2

resolve all civil and administrative sanctions arising from defendant's criminal conduct in this matter and will not subject defendant to denial of exporting privileges.  Defendant waives the statute of limitations as to the Commerce Order, and  further agrees that the Commerce Order will not take effect until defendant's guilty plea is entered to the charge set forth in the Information.

e.   Defendant agrees to enter into a Settlement Agreement with the Secretary of the U.S. Department of Treasury (the "Settlement"), through the Office of Foreign Assets Control, imposing a civil penalty of $10,000, to be paid before sentencing.  The Settlement shall resolve all civil and administrative sanctions arising from defendant's violation of 50 U.S.C. § 1705(a) in this matter.  Defendant waives the statute of limitations as to the Settlement, and further agrees that the Settlement will not take effect until

defendant's guilty plea is entered to the charges set forth in the Information.

f.    Defendant forfeits its right, title and interest in nozzles seized by United States Customs (a legacy agency of United States Immigration and Customs Enforcement) on or about September 24, 1999, and in the sum of $3,000, which represents proceeds from the export of replacement nozzles to Iran in violation of 50 U.S.C. § 1705, 31 C.F.R. §§ 560.204 and 560.205, and Executive Orders 12957, 12959, and 13059.  Defendant shall pay the $3,000 at the time of sentencing.

2.    If the Court rejects this plea agreement and the agreed upon sentence, the defendant shall have, under Rule 11(c)(5)(B), an opportunity to withdraw its guilty plea.

3.    Pursuant to § 6B1.4 of the Sentencing Guidelines, the parties enter into the following stipulations under the Sentencing Guidelines Manual effective November 1, 1998.  It is understood and agreed that: (1) these stipulations are not binding upon either the Probation Department or the

4

Court; and (2) the Court may make factual and legal determinations that differ from these stipulations and that may result in an increase or decrease in the Sentencing Guidelines range and the sentence that may be imposed:

a.   the applicable sentencing guideline for the purpose of determining the appropriate fine is § 8C2.10; and

b.   there is no basis for, and the parties will not seek, either an upward departure or a downward departure under the Sentencing Guidelines.

4.   In exchange for the undertakings made by the government in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

a.   Notwithstanding the waiver provision above, if the government appeals from the sentence, then the defendant may file a direct appeal of his sentence.

b.   If the government does not appeal, then notwithstanding the waiver provision set forth in this paragraph, the defendant may file a direct appeal but may raise only claims that:

1.   the defendant's sentence exceeds the statutory maximum as set forth below; or

2.   the sentencing judge unreasonably departed upward from the otherwise applicable sentencing guideline range.

If the defendant does appeal pursuant to this paragraph, no issue may be presented by the defendant on appeal other than those described in this paragraph.

5.   The government agrees that it will not bring any other criminal charges against the defendant or any of its current or former directors, officers, employees, or shareholders for any conduct arising from the company's shipment or attempted shipment of products directly or indirectly to Iran, identified in the Information.

III.   **ELEMENTS AND EVIDENCE**

The government must establish the following elements beyond a reasonable doubt to prove a violation of

6

50 U.S.C. §1705(b), Executive Orders 12957, 12959 and 13059, and 31 C.F.R. §§560.204 and 560.205:

1.   The defendant willfully

2.   exported, sold, or supplied

3.   to Iran

4.   directly or indirectly from the United States

5.   technology or services

6.   not licensed by United States Treasury, Office of Foreign Assets Control.

        The government would offer the following documents and testimony to satisfy these elements if the case were to proceed to trial:

CONDUCT BEFORE THE 9/3/99 SEIZURE

        1.   September 3, 1997: Notations in Monarch Nozzle General Manager Harry Beccari's daily planner: "Iran: Blank boxes, Henning Elsasser." (Elsasser owns a distribution company in Germany called HP Technik).  The next page of the planner states: "HP Technik Henning Elsasser, Iran order 14,5000 @ $1.92 each."

        2.   September 4, 1997: Fax from Linda Shockey, Beccari's administrative assistant, to Elsasser confirming

7

$1.60 price for the nozzles to Iran. "Please proceed with your official order."

3.  <u>January 27, 1998</u>: Fax from Elsasser to Shockey stating that "This company from Iran did finally open an L/C for 5200 nozzles now.  The price is horrible but I know Harry needs volume and so I decided to accept this order. Please talk to him about a special price for these nozzles because we don't have even 5 cent on each piece."

4.  <u>January 29, 1998</u>: Fax to Elsasser from Shockey in which she states that "NS Nozzles for Iran.  Harry has okayed a .07 reduction on price for the 5200 pcs. (I think he likes you!!) Your order will be ready for shipment by end of February.  If I can push sooner - I will.  Attached is the order acknowledgment." (There is an order acknowledgment dated 1/28/98 for over 19,000 nozzles).

5.  <u>February 6, 1998</u>: Elsasser faxes Shockey telling her "Push as hard as you can please.  I need these nozzles latest 26.02.1998 here in Karlsruhe.  It is mostly because of the 45 (degree) NS nozzles for the Iran order. If you tell me the type you need more time I could maybe cancel some until our next order."

8

6.  **February 11, 1998**: Elsasser faxes Shockey that next week delivery is okay, "We have to get ride (sp) of the Iran staff (?stuff?) on the 26th of February."

7.  **February 13, 1998**: Elsasser faxes Shockey that "I hope delivery time beginning next week is ok because this guy from Iran starts to get on my nerves with earlier and earlier delivery."

8.  **February 16, 1998**: A fax from Mary Slavin at Monarch to Elsasser stating that "your orders shipped on Friday (February 13, 1998).  We will have the flight details later today."  The fax confirms the invoice numbers, including the invoice number per the order acknowledgment of 1/28/98.

9.  **February 19, 1998**: Fax from Shockey to Elsasser stating "Glad to hear the shipment arrived in time to meet your requirements for the L/C from Iran."

10.  **May 1, 1998**: Fax from Shockey to Elsasser stating that Monarch will issue a credit note for the Iran order in the amount of $404.04 (5772 pcs. x $.07).

11.  **June 18, 1998**: Elsasser faxes a letter from the Lakam Company in Tehran, Iran and appends a note to

9

Harry Beccari asking what he should do and to please advise. The letter from the Iranian Company to Elsasser says that they (the Iranians) are interested in working with HP Technik but, as best can be determined from the stilted English, they are after a more competitive price.

12.   <u>June 25, 1998</u>: Elsasser sends a fax to Shockey asking Harry to answer "my different questions" on the last fax.

13.   <u>June 25, 1998</u>: Later that day, Shockey faxes Elsasser that "Harry is working on your fax.  He did say okay to Iran customer - same deal as last time."

14.   <u>October 27, 1998</u>: Fax from Elsasser to Harry Beccari stating that "I did get another order from Iran today for 5772 nozzles Typ R/PLP.  The price is more than lousy but I thought getting up the volume is most important for both of us.  They actually wanted Steinen but I was able to change them to Monarch over the price.  They will pay USD 1.89 per nozzle and I have to cover all banking fees and delivery costs in Germany.  I would appreciate very much if I could get the price of USD 1.63 like last time for this order.  I don't want a credit note for hp!!!"

15. <u>October 27, 1998</u>: Shockey faxes Elsasser that 5,772 R/PLP nozzles for Iran - Okay @ US $1.63 price."

16. <u>February 1, 1999</u>: Elsasser faxes Linda Shockey and asks in somewhat stilted English "Do you want the address from our customer in Iran he isn't allowed to buy in Germany or England anymore.  Do you have you would like to serve him through?"

17. <u>July 21, 1999</u>: Elsasser faxes Shockey that "My customer from Iran contacted me again today (I hat (sp) doing business with him) he needs another 5772 nozzles which I could order separately from you as soon as I get the order. Delivery can't be direct, because he ain't allowed to buy in the USA.  I expect him to do advance payment, hope he accepts or I won't deliver him."

18. <u>July 26, 1999</u>: Fax to Shockey from Elsasser stating that "I think I will get the Iran order for 6000 nozzles in the next 2 days.  I would need this order to be sent to us separately because we don't want to unpack it. Is this possible? Further do we also need the price of $1.60 USD like last year."

19.  <u>July 28, 1999</u>: Fax to Shockey from Elsasser stating that "I did manage to get the Iran order today for 6000 pieces of nozzles.  We have to make a separate order out of this because I don't want to unpack the nozzles here. Means I need a full delivery for this and no part deliveries."

20.  <u>July 30, 1999</u>: Monarch invoice, marked "Office Copy" reflecting 6000 nozzles at a cost of $9,600 to HP Technik, purchase order 990.508 Iran, Monarch No. 14537.

<u>THE SEIZURE</u>

21.  <u>September 3, 1999</u>: Christopher Miller, Export Account Manager for the John A. Steer Freight Forwarding Company, Folcroft, Pennsylvania, called Customs Inspector John Penswater, Office of Field Operations, Outbound Air Group, Philadelphia, Pennsylvania and reported that he had an export shipment from Monarch Nozzle Company, Swedesboro, New Jersey.  The shipment consisted of five boxes, two marked destined for Germany and two marked destined to Iran.[1]  Miller stated that he had contacted Linda Shockey of

---

[1]  These boxes had come into Steer's possession on September 2, 1999 via Air Cargo Express, who had picked them up at Miller's request after he had talked to Linda Shockey on September 1,

Monarch and asked her if the boxes were really going to
Iran.  Shockey became defensive and said that the shipment
was going to Germany, and then they were shipping it to
Iran.  Shockey acknowledged that they had done this in the
past with HP-Technik in Germany. Miller told Shockey "that's
illegal, we can't ship to Iran."  When Shockey responded
that it was going to Germany, Miller told her that knowing
it's going to Iran is transhipping and that was illegal.
Shockey told Miller to black out "Iran" from the two boxes.
When Miller said that he could not do that, Shockey became
abrasive with Miller and told him either to black out "Iran"
or return the boxes to Monarch and they would get another
freight forwarder.  Shortly thereafter, after Miller
conferred with his supervisors, U.S. Customs was called.  On
September 5th or 7th, Shockey called Steer and asked about
the status of the shipment and was told that U.S. Customs
had placed the shipment on hold.

_____      22. **September 3, 1999**: Customs Inspector John
Penswater, examined and detained five Monarch Nozzle Company

------

1999.  The cartons weighed 375 pounds and were valued at $11,068.

cartons containing oil burner nozzles destined for Germany.[2]
Two of the five cartons and their individual packing lists
were marked "Iran."[3]  There was no attempt to hide the
marking as it is scrawled in black magic marker on the
cardboard boxes:  "HP Technik, Iran, Box 1 of 5."  The
proforma invoice for this shipment was signed by Linda
Shockey.

     23.  <u>September 3, 1999</u>: Linda Shockey sends an
urgent fax on Monarch stationary to Henning Elsasser that
she needs to speak with him concerning his shipment.

<u>CONDUCT AFTER THE 9/3/99 SEIZURE</u>

     24.  <u>September 9, 1999</u>:  Inspector Penswater
received a message that Shockey had called.  On September
10, 1999, Penswater returned Shockey's call and, at her
request, faxed her the documents authorizing Customs to
detain Monarch's shipment.  Later that same day, Penswater

---

[2]  The boxes were addressed to HP-Technik, Gablonzerstrasse
21, 76185 Karlsruhe, Germany, Attn: Henning Elsasser.

[3] The packing list had Iran listed next to purchase order
number 990.508, Monarch No. 14537. This order was for 6000
nozzles: (1440) 1.00 GPH x 60 deg. MTDR; (900) 1.50 GPH x 60 deg.
MTDR; (900) 2.00 GPH x 60 deg. MTDR; (900) 2.25 x 60 deg. MTDR;
(900) 2.50 x 60 deg. MTDPLP; (600) 8.50 x 60 deg. MTDPLP; (36)
2.50 x 45 deg. MTDPLP.

received a call from a person who identified himself as a
manager from Monarch but would not provide his name.  The
manager asked for permission to record the conversation and
then complained that "I pay your salary and your taxes," and
"why would you put people out of work because of what was
written on a box?"  When Penswater told the "manager" that
his boxes were being detained because the documentation
indicated that they may be diverted to Iran, the Monarch
"manager" stated that they were going to Germany.  Upon
being asked why Iran was written on the boxes and packing
slips, the "manager" refused to answer the question.  When
asked who the end user was, the "manager" said it wasn't his
concern what Germany does with the nozzles and that he
didn't care.

        25.  September 10, 1999: Elsasser faxes Linda
Shockey a handwritten note and says that he got an order for
one piece (and provides the specifications).  He adds
"Please add this nozzle to the Iran order when you pack it
new . . . Looking forward to receive the order through a new
forwarder soon."

26. <u>September 20, 1999</u>: Exodus Command Center, U.S. Customs, Washington, D.C. determined that Monarch Nozzle did not have a license to ship goods to Iran.

27. <u>September 22 & 23, 1999</u>: U.S. Customs seized the original paperwork related to the above shipment. Steer told Customs that between September 1998 to September 1999 approximately 9 shipments were made by Monarch to HP Technik. For three of those shipments, the Monarch contact person was Kathy Hanly; for the last six shipments, the contact person was Linda Shockey.

28. <u>September 24, 1999</u>: General Manager Harry Beccari faxes Elsasser that "Big problems with Customs Special Agent assigned. We may have to send you a replacement until we can clear it."

29. <u>October 1999</u>: All during this month messages are being faxed to Monarch by Elsasser such as on <u>October 10, 1999</u>: "Please add to the Iran order when you get it back" ordering 300 1.35 x 80 degree MTDNS on purchase order 990.655. Other similar messages are: "Were you successful with the Iran delivery, I really need this stuff; Hope to hear positive news concerning the Iran delivery soonest

because my trouble really gets bigger day by day." On

October 11, 1999 Elsasser faxes that "Following this page

will you receive a big order as requested from you . . .

Anything new concerning the Iran order?  We very urgently

need the brass nozzles, our customer can't send out his

cleaning machines (DM 15,000,-) because of the missing

nozzles.  Please send me the letter from the special agents

by fax.  I want to frame it and put it on the wall here in

my office."

        30.  Comparison of confiscated shipment to new
order placed on October 11, 1999:

```
Seized Shipment                  New Shipment

Invoice # 22065                  Invoice # 22673
Date Ordered: 7/30/99            Date Ordered: 10/11/99
Order # 14537                    Order # 15053
Purchase Order # 990.508         Purchase Order # 990.674
Date Shipped: 8/31/99            Date Shipped 10/29/99


1440 1.00 GPH x 60° MTDR          600 1.00 GPH x 60° MTDR
 900 1.50 GPH x 60° MTDR          900 1.50 GPH x 60° MTDR
 900 2.00 GPH x 60° MTDR          684 2.00 GPH x 60° MTDR[4]
 900 2.25 x 60° MTDR              600 2.25 x 60° MTDR
 900 2.50 x 60° MTDPLP            300 2.50 x 60° MTDPLP
 600 8.50 x 60° MTDPLP            300 8.50 x 60° MTDPLP
 360 2.50 x 45° MTDPLP              0 2.50 x 45° MTDPLP
```

---

  [4]   900 were ordered but only 684 were sent.  The remaining 226
        were shipped out on November 11, 1999.

                              17

31. **November 1, 1999**: Fax from John Liebe, BAX Global, a freight forwarder, to Kim Lombardo, BAX, America stating "Monarch Nozzle has convinced their largest customer in Germany to use us for exports out of Swedesboro, NJ. We're handling the first shipment today, and it's a hot one."[5]

32. **November 4, 1999**: Fax from Elsasser to Shockey stating "Thank you very much for the list of the delivery. It is good that the old staff (?stuff?) is on the delivery and all sizes we are short of right now."

33. **Testimony by Harry Beccari**. Beccari would tesify as follows pursuant to an immunity agreement with the government: he was the general manager of Monarch in September 1999 and had been in that position since March 1994, having worked his way up in the company from being a helper on the shop floor in 1977. Bob Onraet was his immediate supervisor, the president of Monarch Nozzle, and

---

[5] When interviewed, representatives of BAX claimed that this designation was less sinister than it appeared, meaning only that it was a new customer who wanted this shipment delivered quickly.

the chief controlling officer of the JEP Manufacturing Group.[6]

Beccari became aware of the seized shipment of nozzles, bound for HP Technik, Monarch's German distributor, in September 1999.  He stated that, at the time of the seizure, he was unaware that it was illegal to ship to Iran. He told Onraet of the Customs seizure, and made his own efforts, at Onraet's suggestion, to try and get the seizure released by Customs.  Onraet told him that he, Onraet, did not believe it was a serious matter and said that they would just pay the fine, get the shipment out, and "life goes on."

Beccari would further testify that he got into a heated argument on the telephone with a Customs agent.

IV.      <u>STATUTORY MAXIMUM SENTENCE</u>

The Court may impose the following statutory maximum sentence: five years probation, a fine of not more than $50,000 or twice the gross gain or loss resulting from the offense, and a $400 special assessment.  Defendant may

---

[6]  As indicated earlier, in September 1999, Monarch was still a division of Newton Tool, and under the umbrella of JEP Manufacturing Group, Incorporated.

also be subject to the denial of exporting privileges for a period up to 10 years.

V.      THE GOVERNMENT'S SENTENCING RECOMMENDATION

Pursuant to the parties' plea agreement, and Fed.R.Crim.P. 11(c)(1)(C), the government agrees that the sentence outlined above in the discussion of the plea agreement appropriately disposes of the case.

Respectfully submitted,

PATRICK L. MEEHAN
United States Attorney


_____
CHRISTOPHER R. HALL
Assistant United States Attorney
Validation of Sig. Code:  CRH4364

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing court paper has been served by first class United States mail, postage prepaid, upon the following counsel of record:

James m. Becker, Esq.
Saul Ewing
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186

_____

**CHRISTOPHER R. HALL**
**Assistant United States Attorney**

DATED: